2020 IL App (1st) 190688-U

FIFTH DIVISION
Order filed: July 10, 2020

No. 1-19-0688

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County |
| v. | ) ) | No. 08CR4056 (02) |
| DEMETRIUS WARREN, | ) ) | Honorable Dennis J. Porter, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE HOFFMAN delivered the judgment of the court.
Justices Rochford and Delort concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm the defendant's convictions, finding that his claim that his trial counsel labored under a *per se* conflict of interest is barred by the law-of-the-case doctrine. We affirm the defendant's sentence finding that the trial court properly applied the factors contained in *Miller v. Alabama*, 567 U.S. 460 (2012), before sentencing.

¶ 2    The defendant, Demetrius Warren, filed the instant appeal contending that he is entitled to a new trial because his trial counsel labored under a *per se* conflict of interest when she contemporaneously represented him and Corey Jackson, an alleged witness for the prosecution. He also argues that we should vacate his sentence and remand for a new sentencing hearing

because he was a juvenile at the time he committed the instant offenses and the trial court imposed a discretionary *de facto* life sentence even though he was not irretrievably depraved, permanently incorrigible, or irreparably corrupt beyond the possibility of rehabilitation. For the reasons that follow, we affirm.

¶ 3 The defendant was charged by indictment with, *inter alia*, first degree murder with a firearm (720 ILCS 5/9-1(a)(1) (West 2006)), multiple counts of armed robbery (720 ILCS 5/18-2(a)(2) (West 2006)), and aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2006)). These charges arose from a series of armed robberies and attempted armed robberies perpetuated by the defendant when he was 17 years old, along with Eric Walker, Benjamin Williams, and Jamal Bracey, resulting in the death of Amadou Cisse. The defendant was transferred from juvenile court and tried as an adult under the mandatory transfer provision of the Juvenile Court Act (705 ILCS 405/5-120 (West 2010)).

¶ 4 Following a jury trial, the defendant was found guilty of first degree murder, three counts of aggravated armed robbery with a firearm, and one count of aggravated discharge of a firearm. The court sentenced him to 80 years' imprisonment for murder (730 ILCS 5/5-4.5-20(a) (West 2010)), which included a mandatory 15-year enhancement for possession of a firearm (730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2010)). This sentence was to run consecutively to a 40-year sentence for one count of armed robbery (730 ILCS 5/5-8-4(d)(1) (West 2010)), plus 8 years for each of the remaining armed robberies, to be served concurrently, and 15 years for aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2010)), also to be served concurrently, for a total of 120 years' imprisonment.

¶ 5 On direct appeal, the defendant maintained that: (1) his conviction should be reversed because defense counsel labored under a *per se* conflict of interest when she contemporaneously

represented both him and a State witness during preliminary proceedings; and (2) the statutory scheme under which he was prosecuted and sentenced violated his rights under the State and federal constitutions by mandating that he be sentenced as an adult and giving no regard to his youthfulness and its attendant circumstances. This court affirmed his conviction and sentence. *People v. Warren*, 2013 IL App (1st) 113776-U.

¶ 6　　Thereafter, the defendant filed a petition for leave to appeal to the Illinois Supreme Court. On November 23, 2016, the supreme court entered an order denying his petition, but in the exercise of its supervisory authority, directed this court to vacate its judgment and reconsider the matter in light of its holding in *People v. Reyes*, 2016 IL 119271.

¶ 7　　In compliance with the supervisory order, this court vacated its judgment in *Warren*, 2013 IL App (1st) 113776-U, and issued its judgment on reconsideration. Before issuing its decision, this court denied the defendant's motion for leave to supplement the record with the transcript of Jackson's grand jury testimony, which the defendant alleged established that his counsel, Brett Balmer, labored under a *per se* conflict of interest by representing him and a prosecution witness. We again rejected the *per se* conflict of interest argument, reasoning that Jackson did not become a State witness until he entered into a plea agreement with the State on May 6, 2008, at which point, Balmer was no longer representing the defendant. We also affirmed the defendant's convictions, vacated his sentence, and remanded the cause to the trial court for resentencing. *People v. Warren*, 2017 IL App (1st) 113776-U.

¶ 8　　On remand, the trial court sentenced the defendant to 54 years' imprisonment for murder, which was to run consecutively with a 10-year sentence for one count of armed robbery, plus 6 years each on the two remaining robbery charges to be served concurrently with the 10-year

robbery sentence, for a total of 64 years' imprisonment. The defendant subsequently filed a motion to reconsider his sentence, which the trial court denied. This appeal followed.

¶ 9 On appeal, the defendant first maintains that this court should reverse his convictions and remand for a new trial because the record, which now includes the transcript of Jackson's grand jury testimony, establishes that his trial counsel labored under a *per se* conflict of interest by contemporaneously representing him and Jackson while Jackson was a State witness. We disagree.

¶ 10 The record evinces the following relevant facts. The defendant made his first appearance in this case on January 11, 2008, accompanied by an unidentified assistant public defender. At the beginning of the proceedings, the court inquired whether the defendant had retained counsel, to which he responded that he had not. The assistant public defender informed the court that someone from his office had appeared in this case and should have been present to represent the defendant, but that "nobody knows who represented him." The court then appointed an assistant public defender, Balmer, who was present in the court room on another matter, to represent the defendant. Balmer agreed to do so, but stated that she did not "want to interfere with the process." The court then proceeded to inform the defendant of the allegations against him for armed robbery, attempted armed robbery, and aggravated discharge of a firearm (first arraignment). Balmer accepted the appointment, entered pleas of not guilty, and requested leave to file motions and discovery. The court continued the case to January 31, 2008, where the judge again inquired whether the defendant had retained counsel, to which he replied that he had not, prompting the court to again appoint Balmer. The court once again informed the defendant of the allegations against him. Balmer accepted her appointment on behalf of the defendant, entered a

plea of not guilty, waived formal reading of the indictment, and requested leave to file her appearance and engage in discovery. The court then continued the case until February 26, 2008.

¶ 11    On February 11, 2008, Jackson (who is not a co-defendant in the matter) was called as a witness by the State to offer testimony before the grand jury. Jackson testified that, on January 11, 2008, he was in a group of courthouse cells, known as the "bullpen," awaiting a hearing on two offenses unrelated to the defendant's case. At the time, Jackson was also being represented by Balmer. According to Jackson, he and the defendant were in one cell, and Walker was in an adjacent cell. He further testified that, while in the bullpen, the defendant claimed that the State did not have any evidence on them and encouraged Walker to say that "Benjamin Williams did it." According to Jackson, the defendant said, "[M]an, don't you want to go home? I want to go home, too. *** [T]he only thing we got to do is say [Williams] did it." Jackson further testified that the defendant reassured Walker that they did not have to worry about the victim saying anything to contradict their testimony, by stating, "[W]e ain't got to worry about dude, *** I whacked [him] off the map, he's dead, he ain't here, he can't tell what happened."

¶ 12    On February 21, 2008, an indictment was returned against the defendant charging him with first degree murder with a firearm, armed robbery, attempted armed robbery, and aggravated discharge of a firearm. That same day, an appearance was filed in the defendant's case by privately retained counsel, Richard Kling, at which point, Balmer was no longer representing the defendant. On February 26, 2008, the defendant and his co-defendants were arraigned on the charges in this case (second arraignment). At the commencement of the proceedings, Susanna Ortiz appeared for the defendant "on behalf of" her law partner Kling and requested leave to continue Kling's appearance "from the Branch 66 court." Balmer was also present but was representing co-defendant Bracey. She addressed the court as follows:

"If I may for the record, Brett Balmer. I was previously appointed on [behalf of the defendant]. That was on his *** first arraignment *** on the original charge. For him it was the armed robbery. He was not at that time charged with the murder. Since that time Chief Judge appointed Mr. Kling to represent him. I do want to state for the record that I had been representing [the defendant]. I did visit him and talked to him in the jail, but I don't believe there is a conflict in [co-defendant] Bracey's case."

¶ 13 Ortiz then proceeded to represent the defendant through the arraignment. On the next court date, March 25, 2008, Balmer was replaced as Bracey's counsel by another assistant public defender, and Balmer withdrew from the case entirely.

¶ 14 At trial, the State offered the testimony of Jackson, who presented the same testimony as he did before the grand jury. He also testified that, at some point, he spoke to the police about the conversation he overheard between the defendant and Walker. He was in a jail cell when two police officers entered and began "grabbing" people. The officers transported him to the police station, where he informed them of what he overheard. According to Jackson's testimony, at the time of this discussion, there was no one else in the room with him apart from the two officers. Following this conversation with the police, he was returned to the jail, and the record reflects that, on February 11, 2008, he testified before the grand jury. The record indicates that, on May 6, 2008, he entered into a plea agreement with an Assistant State's Attorney to testify to his statements regarding the defendant in exchange for a reduced sentence on the charges he was currently facing. Jackson testified that, during this period of time, Balmer remained his counsel.

¶ 15 It is well established that the right to effective assistance of counsel encompasses a defendant's right to conflict-free representation, meaning assistance by an attorney whose loyalty

is undiluted by conflicting interests or inconsistent obligations. *People v. Hernandez*, 231 Ill. 2d 134, 142 (2008); *People v. Morales*, 209 Ill. 2d 340, 345 (2004); *People v. Moore*, 189 Ill. 2d 521, 538 (2000). In order to prove ineffective assistance based upon a conflict of interest, the defendant bears the burden of showing either that his attorney labored under an *actual* conflict of interest, or that a *per se* conflict existed. *Hernandez*, 231 Ill. 2d at 142; *Moore*, 189 Ill. 2d at 538; *People v. Flores*, 128 Ill. 2d 66, 83-84 (1989). Where a *per se* conflict is present, the defendant need not show that he was prejudiced by the conflict or that his attorney's performance was in any manner affected by its existence; automatic reversal is warranted, unless the defendant waived his right to conflict-free representation. *Morales*, 128 Ill. 2d at 345 (citing *People v. Spreitzer*, 123 Ill. 2d 1, 17 (1988)).

¶ 16     The supreme court has found a *per se* conflict where certain facts about a defense counsel's status, by themselves, are found to engender a disabling conflict. *People v. Taylor*, 237 Ill. 2d 356, 374 (2010). Such a conflict can exist where defense counsel has a contemporaneous relationship with the victim, the prosecution, or an entity assisting the prosecution, or where defense counsel has contemporaneously represented a witness for the prosecution. *Id.*; *Morales*, 209 Ill. 2d at 345-46. When deciding whether a *per se* conflict of interest exists, the reviewing court should make a "realistic appraisal of defense counsel's professional relationship to someone other than the defendant under the circumstances of each case." *People v. Daly*, 341 Ill. App. 3d 372, 376 (2003) (quoting *People v. Hernandez*, 246 Ill. App. 3d 243, 249 (1993)). Because the facts of this case are not in dispute, our review is *de novo. People v. Fields*, 2012 IL 112438 ¶ 19.

¶ 17     In our prior decision in this matter (*People v. Warren*, 2017 IL App (1st) 113776-U), we found that there was no *per se* conflict of interest because, at the time Balmer represented the

defendant up to February 21, 2008, when Kling filed his appearance, Jackson was not yet a State witness. Consequently, the State maintains that this claim is barred by the law-of-the-case doctrine. The defendant maintains that, because the grand jury transcripts of Jackson's testimony were not a part of the record at the time of this court's prior decision, we could not determine whether Jackson served as a State witness during the period of overlap in Balmer's representation of both him and Jackson. Therefore, the defendant asserts that this argument should not be barred by the law-of-the-case doctrine, and we should consider the argument on its merits. We disagree.

¶ 18    The law-of-the-case doctrine limits relitigation of a previously decided issue in the same case. *Rommel v. Illinois State Toll Highway Authority*, 2013 IL App (2d) 120273, ¶ 15. It settles, for all subsequent stages of a suit, the particular views of law announced by the court in a prior order or decision. The rule is based upon the sound policy that, where an issue is once litigated and decided, the issue is settled for all subsequent stages of the suit. *McDonalds Corp. v. Vittorio Ricci Chicago, Inc.*, 125 Ill. App. 3d 1083, 1086-87 (1984). The law-of-the-case doctrine is generally applied to the findings and holdings of a reviewing court to subsequent proceedings on remand.

¶ 19    Courts have recognized two exceptions to the application of the law-of-the-case doctrine: (1) when a higher reviewing court, subsequent to the lower court's decision, makes a contrary ruling on the same issue; and (2) when a reviewing court finds its prior decision was palpably erroneous. *Norris v. National Union Fire Insurance Co.*, 368 Ill. App. 3d 576, 58 (2006). Neither of those exceptions are present here, and this court has made a final decision on the *per se* conflict of interest issue. Therefore, we find that the argument is barred from relitigation by the law-of-the-case doctrine.

¶ 20    However, law-of-the-case doctrine aside, the defendant's argument is without merit because the grand jury transcript of Jackson's testimony proves only that he testified on February 11, 2008, while he was represented by the same attorney as the defendant. It does not establish that Jackson was a State witness testifying against the defendant in an adversarial proceeding for which charges had been entered against him. "A grand jury proceeding is not an adversary hearing in which the guilt or innocence of the accused is adjudicated; rather, it is an *ex parte* investigation to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person." *People v. Sevedo*, 2017 IL App (1st) 152541, ¶ 42 (citing *People v. Creque*, 72 Ill. 2d 515, 527 (1978)). At the time of Jackson's grand jury testimony, no indictment had been issued against the defendant for murder and Jackson was a grand jury witness, not a State witness testifying in an adversarial proceeding against the defendant. In fact, the record reflects that Jackson was only a potential State witness at the time of the grand jury proceeding and did not become a State witness until May 6, 2008, when he entered into a plea agreement with the State to testify at trial. See *Morales*, 209 Ill. 2d at 346 (holding that a *per se* conflict of interest does not exist where defense counsel contemporaneously represented only a potential State witness). Accordingly, we find that there was no *per se* conflict of interest.

¶ 21    Next, the defendant maintains that we should vacate his sentence and remand for a new sentencing hearing because the trial court erred in imposing a discretionary *de facto* life sentence for the instant offenses he committed when he was a juvenile. We disagree.

¶ 22    The United States Supreme Court has held that the eighth amendment to the United States Constitution "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Miller v. Alabama*, 567 U.S. 460, 479 (2012). The Court

emphasized that "[m]andatory life without parole for a juvenile precludes consideration" of numerous mitigating factors, including the juvenile's age and its "hallmark features," and the possibility of rehabilitation. *Id.* at 477-78.

¶ 23    The Illinois Supreme Court has held that *Miller* applies to discretionary, as well as mandatory life sentences (*People v. Holman*, 2017 IL 120655, ¶ 40), and also to *de facto* life sentences, or sentences "that cannot be served in one lifetime" and have "the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole" (*People v. Reyes*, 2016 IL 119271, ¶¶ 9-10). The supreme court has also concluded that a sentence exceeding 40 years is a *de facto* life sentence. *People v. Buffer*, 2019 IL 122327, ¶ 42.

¶ 24    A juvenile defendant may be sentenced to life without parole if the sentencing court determines the defendant's conduct "showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Holman*, 2017 IL 120655, ¶ 46. Before a trial court imposes a life sentence or *de facto* life sentence on a juvenile defendant, it must consider "[the] defendant's youth and its attendant circumstances." *Buffe*r, 2019 IL 122327, ¶ 42. A defendant's youth and attendant characteristics of youth include, but are not limited to, the following:

> "(1) the juvenile defendant's chronological age at the time of the offense and any
> evidence of his particular immaturity, impetuosity, and failure to appreciate risks
> and consequences; (2) the juvenile defendant's family and home environment; (3)
> the juvenile defendant's degree of participation in the homicide and any evidence
> of familial or peer pressures that may have affected him; (4) the juvenile
> defendant's incompetence, including his inability to deal with police officers or
> prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile

defendant's prospects for rehabilitation." *Holman*, 2017 IL 120655, ¶ 46, (citing *Miller*, 567 U.S. at 477–78).

Whether a sentencing court complied with *Miller* is a backwards-looking inquiry. *Holman*, 2017 IL 120655, ¶ 47.

> "In revisiting a juvenile defendant's life without parole sentence, the only evidence that matters is evidence of the defendant's youth and its attendant characteristics at the time of sentencing. Whether such evidence exists depends upon the state of the record in each case. A court revisiting a discretionary sentence of life without parole must look at the cold record to determine if the trial court considered such evidence at the defendant's original sentencing hearing." *Id*.

A trial court is vested with wide discretion in sentencing and we will not alter the sentence absent an abuse of discretion. *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000).

¶ 25    In the case at bar, the record reflects that, at the re-sentencing hearing, the trial court applied the *Miller* factors before sentencing the defendant to a total of 64 years in prison. With respect to the first factor—the defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences—the trial court noted that the defendant was almost at the age of the majority, 17 years and six months old, when he committed the crimes. It also noted that the defendant "directed the other juveniles to assault [co-defendant Walker]" and that he was "planning to put the blame on another one of [the] co-defendants back in the lockup."

¶ 26    As to the second factor—the defendant's family and home environment—the trial court considered that the defendant had a difficult upbringing without a father but stated that there was

no evidence of family drug abuse. It noted that he does not get along well with most of his siblings, and it also considered the letters that his younger sister and other relatives had written indicating their beliefs of his rehabilitative potential.

¶ 27    In considering the third factor—the defendant's degree of participation in the homicide— the trial court emphasized that the defendant was the "prime malefactor" in that he shot the victim. The court also noted the fact that the defendant was not peer pressured into committing the crimes, but was instead peer pressuring the other participants.

¶ 28    With respect to the fourth factor—the defendant's incompetence—the court found "no evidence of incompetence." This conclusion was supported by the fact that the defendant was made "the enforcer for the Gangster Disciples while in jail," showing that he has the "ability to deal with his peers" and that there was no evidence that he lacked capacity to "assist his own attorneys."

¶ 29    In considering the fifth factor—the defendant's prospects for rehabilitation—the court acknowledged that, in his statement in allocution, the defendant admitted to making mistakes; however, it "didn't hear anything approaching I'm sorry for what I did." The court also stated:

> "I have to say, Mr. Warren, the cases how they talk about if your conduct shows
> irretrievable depravity, permanent incorrigibility or irreparable corruption beyond
> the possibility of rehabilitation, you are right there. I am thinking that I would be
> probably perfectly justified in not changing your sentence one iota. I came very
> close to doing just precisely that. However, principally because of your statement,
> I'm thinking maybe there is some hope for you possibly."

¶ 30    Here, we find that, prior to imposing a *de facto* life sentence on the defendant, the trial court considered the *Miller* factors. It specifically considered the defendant's youth and attendant

circumstances and his rehabilitative potential before determining that his conduct showed "irretrievable depravity, permanent incorrigibility or irreparable corruption beyond the possibility of rehabilitation." The defendant asserts that the trial court's comment "maybe there is some hope for you possibly" is inconsistent with the court's conclusion that the defendant is incorrigible and therefore, he should be sentenced to less than 40 years. However, when viewed in context with the entire proceeding, we find that the court's comment that there may be some hope for the defendant is not the same as the court concluding that he could be rehabilitated, especially in light of the court explicitly stating that the defendant was incorrigible, did not come close to expressing remorse for his actions, that he was the "prime malefactor" during the crimes, and that his offenses were "about as aggravating as you can get." See *People v. Croft*, 2018 IL App (1st) 150043, ¶ 31 (finding that the trial court's statements that the defendant's "light at the end of the tunnel" in terms of clemency or mercy was "not unrealistic for the defendant" to achieve was not the same as the court finding that the defendant was capable of being rehabilitated when taken in context with the entire proceeding). Therefore, based on the record before us, we cannot say that the defendant's sentence was constitutionally defective or an abuse of discretion.

¶ 31    Accordingly, we affirm the defendant's convictions and sentence.

¶ 32    Affirmed.